**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

| | | |
|---|---|---|
| **KTK MINING OF VIRGINIA, LLC,** | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **CIVIL ACTION NO. 12-00655-KD-C** |
| | : | |
| **CITY OF SELMA, ALABAMA,** | : | |
| **Defendant.** | : | |

## ORDER

This action is before the Court on the Motion for Partial Summary Judgment (Doc. 58) filed by Plaintiff KTK Mining of Virginia, LLC ("KTK") and the Motion for Summary Judgment (Doc. 57) filed by the Defendant City of Selma, Alabama ("the City") along with the various briefs and exhibits (Doc. 59 – 61, 63-1, 67 – 73) in support of or opposition to same. The motions have been taken under submission (see Docs. 62, 78) and are ripe for adjudication. Upon consideration, and for the reasons set forth herein, the Court finds that KTK's motion is due to be **GRANTED** and that the City's motion is due to be **DENIED** as to KTK's procedural due process claims.[1]

### I.    Procedural History

On October 17, 2012, Plaintiffs KTK and Todd Kiscaden ("Kiscaden") initiated this action by filing a Complaint (Doc. 1) with the Court, asserting causes of action against the City and its Chief of Police, William T. Riley ("Riley), pursuant to 42 U.S.C. § 1983 (for alleged violations of their rights under the First, Fifth, and Fourteenth Amendments of the United States Constitution) and state law.  On March 19, 2013, Plaintiffs, with leave of the Court (Doc. 23),

---

[1] KTK has also submitted supplemental authority by which it argues the Court should also *sua sponte* grant it summary judgment as to its First Amendment claims.  (Doc. 77).  The Court will not address that issue in this Order.

filed an Amended Complaint (Doc. 28), the operative pleading in this action.[2]  See, e.g., Pintando v. Miami-Dade Hous. Agency, 501 F.3d 1241, 1243 (11th Cir. 2007) ("As a general matter, an amended pleading supersedes the former pleading; the original pleading is abandoned by the amendment, and is no longer a part of the pleader's averments against his adversary." (quotation omitted)).  The Amended Complaint also asserted claims pursuant to both § 1983 and state law.[3]

Both the City and Riley filed a motion to dismiss all claims asserted in the Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6).  (Doc. 29).  Briefing was conducted on the motion to dismiss, after which the Magistrate Judge issued a Report and Recommendation on the motion.  (Doc. 40).  On July 2, 2013, the Court adopted in part the Report and Recommendation and dismissed all of Kiscaden's claims, all claims against Riley, and some claims against the City.  (Doc. 44).  The Court expressly found that the following counts of the Amended Complaint were not dismissed and remained pending against the City: "Count One (First Amendment and procedural due process claim); Count Four (conversion as to personal property); Count Five (negligence and wantonness); Count Seven (permanent injunctive relief); and Count Eight (appeal of the suspension/revocation of KTK's building permit by the

---

[2] The Court denied as untimely the Plaintiffs request to file a second amended complaint.  (Doc. 36).

[3]      The Court finds that it has original jurisdiction over the Plaintiffs' federal claims pursuant to 28 U.S.C §§ 1331 (federal question) and 1343(a)(3), see Gonzalez-Cancel v. Partido Nuevo Progresista, 696 F.3d 115, 119 (1st Cir. 2012) ("Because [28 U.S.C. § 1343(a)(3)] mirrors the text of § 1983, federal jurisdiction will attach if a plaintiff has alleged a colorable claim under § 1983."), and supplemental jurisdiction over the Plaintiffs' state-law claims pursuant to 28 U.S.C. § 1367(a).
         The Court also finds that it has diversity jurisdiction over all claims pursuant to 28 U.S.C. § 1332. Both Plaintiffs are alleged to be citizens of Tennessee (Kiscaden is alleged to be the sole member of KTK, a limited liability company), while both Defendants are alleged to be Alabama citizens.  Sufficient facts have also been pled to establish that the amount in controversy exceeds $75,000, exclusive of interests and costs.

City of Selma)." (Id. at 2).  KTK's present motion requests partial summary judgment in its favor "for the relief demanded for the violation of [KTK]'s Fourteenth Amendment procedural due process claims under Count I and Count VIII of the []First Amended Complaint." (Doc. 58 at 1).  Though the City has moved for summary judgment on all of KTK's claims, the Court will presently only address the motion as it relates to KTK's procedural due process claim.

## II.    Standard of Review

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Rule 56(c) governs procedures and provides as follows:

(1) **Supporting Factual Positions.** A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
   (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
   (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

(2) **Objection That a Fact Is Not Supported by Admissible Evidence.** A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.

(3) **Materials Not Cited.** The court need consider only the cited materials, but it may consider other materials in the record.

(4) **Affidavits or Declarations.** An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.

Fed. R. Civ. P. 56(c).

A party seeking summary judgment bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). The mere existence of a factual dispute will not automatically necessitate denial; rather, only factual disputes that are material preclude entry of summary judgment. Lofton v. Sec'y of Dep't of Children & Family Servs., 358 F.3d 804, 809 (11th Cir. 2004).

If a non-moving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to summary judgment. Celotex, 477 U.S. at 323. In reviewing whether a non-moving party has met its burden, the Court must stop short of weighing the evidence and making credibility determinations of the truth of the matter. Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in its favor. Tipton v. Bergrohr GMBH-Siegen, 965 F.2d 994, 998-99 (11th Cir. 1992) (internal citations and quotations omitted).

" 'Cross-motions for summary judgment will not, in themselves, warrant the court in granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed . . . Nonetheless, cross-motions may be probative of the non-existence of a factual dispute when . . . they demonstrate a basic agreement concerning what legal theories and material facts are dispositive.' " United States v. Oakley, 744 F.2d 1553, 1555-56 (11th Cir. 1984) (quoting Bricklayers Int'l Union, Local 15 v. Stuart Plastering Co., 512 F.2d 1017 (5th Cir. 1975)) (per curiam) (second ellipsis added). See also Wermager v.

Cormorant Twp. Bd., 716 F.2d 1211, 1214 (8th Cir. 1983) ("[T]he filing of cross motions for summary judgment does not necessarily indicate that there is no dispute as to a material fact, or have the effect of submitting the cause to a plenary determination on the merits.").

**III.    Facts**

The Confederate Memorial Circle ("the Circle") is a one-acre tract of land located in the City's Old Live Oak Cemetery.  The Circle was established in 1877 by a resolution of the Selma City Counsel granting a petition by members of the Ladies of the Confederate Memorial Association requesting a donation of one acre of ground located in that area upon which to erect a monument to the Confederate dead.  In addition to hosting a Confederate memorial, the Circle serves as a burial place for 195 Confederate dead and is the site of a World War I memorial.  A monument to Confederate General Nathan Bedford Forrest was added to the Circle in 2001 after the Selma City Council ordered that it be moved there from another location, where it had been erected in 2000 by an organization known as the Friends of Forrest ("FOF").  In March 2012, persons unknown vandalized the Forrest monument.

On August 2, 2012, KTK entered into a contract with Selma Chapter 53 of the United Daughters of the Confederacy ("UDC"), for the sum of $1.00 and other consideration, to perform construction work on the Circle for the purpose of making improvements.  The UDC, along with the City, has taken part in the maintenance of the Circle for over 100 years.  KTK estimates that, when completed, the work it planned to perform for the UDC would have a value of $163,200.  KTK agreed to perform this work on a non-profit basis, with all costs and expenses to be either borne by KTK or reimbursed by private contributions.  On August 6, 2012, KTK entered into a contract with FOF to make improvements to the Circle and to relocate and secure the Forrest

5

monument within the Circle. KTK estimates that, when completed, the work it planned to perform for FOF would have a value of $56,300. KTK also agreed to perform this work on a non-profit basis and to bear most costs and expenses, other than those which FOF members might wish to cover voluntarily.

On August 3, 2012, pursuant to City Ordinance No. 01-9091, the Selma Historic Development Commission issued UDC and FOF a Certificate of Appropriateness for the Circle refurbishing project. That same day, the required Certificate of Appropriateness having been first obtained (due to the fact that the planned work was taking place in a historic district), KTK was issued a building permit from the City's Department of the Building Inspector to proceed with the project. KTK then began its work on the Circle.

On August 9, 2012, a protester, Rose Sanders a/k/a Faya Toure ("Toure"), entered the construction site and caused a disruption. On or about August 23, 2012, Toure and other protesters entered the construction site and attempted to halt KTK's work by climbing on structures and lying down in areas where work was occurring. Later that day, KTK, the protestors, the City mayor, and the City Attorney agreed to cease all activity, including work and protests, in the Circle until after municipal elections were held on August 28, 2012. The next morning, the protesters returned to the Circle and caused further damage to the construction site.

The evening of August 28, 2012, after the polls had closed, KTK employees returned to the Circle to resume work but were prevented from doing so by Chief Riley, who threatened arrest if they did so. On August 29, 2012, a meeting was held at Selma City Hall involving KTK, City officials, and a representative for the protestors, at which KTK agreed not to return to the Circle to perform work for a period of one week, to give time for the City Council to meet

and resolve issues related to the project.  KTK and its employees have not performed any further work at the Circle since the confrontation with Chief Riley on August 28, 2012.

The City Council held a meeting on September 25, 2012.  At this meeting, Toure and other City citizens were permitted to address the City Council regarding the UDC's purported license to use the Circle, asking that the Council revoke that license.  At some point, one council member made "a motion . . . to stop the Permit of building the Nathan Bedford Forrest Monument, and revoke the Permit."  (Minutes of 9/25/2012 City Council Meeting, Doc. 58-4 at 3).  After further discussion, the following exchange occurred:

> Councilman Atchison asked Councilwoman Crenshaw if her vote was to suspend any work until there is a Court Ruling [on the issue of the UDC's license to use the Circle]?  Councilwoman Crenshaw answered, and stated "yes."  Councilman Atchison stated that he would "second" that motion.  Councilman Atchison stated that this is to suspend all work until a Court Ruling on the ownership. Councilwoman Crenshaw asked, do we want to use "ownership"?  Councilwoman Crenshaw stated that they already know who owns the property.  [City ]Attorney Nunn stated that he does not think that their lawsuit is dealing with the ownership. Councilman Atchison stated that his "second" was based on ownership.  Attorney Nunn stated that they do agree that we have our deed that shows ownership of the 18 acres, that maybe the motion should be to suspend until a Court Ruling as it relates to the use.  President Pro Tempore Bowie asked Councilwoman Crenshaw if that was the motion she is making?  Councilwoman Crenshaw answered, and stated "yes".  President Pro Tempore Bowie stated that he would "second" that motion.  Councilwoman Keith asked what was the motion?  President Pro Tempore Bowie asked Councilwoman Crenshaw to repeat the motion. Councilwoman Crenshaw stated the motion is to suspend the license until there is a ruling on the use/ . . . ownership of the property; there will be no building at all, no work done, until the ruling is handed down.  A roll call was taken and the motion passed with a majority vote of the Council Members present.

(Id.).

No item regarding KTK's building permit was included on the meeting agenda, and there is no evidence that KTK was given notice that such an action might take place at the meeting.

The City's building inspector has never revoked the building permit or issued a stop-work order against KTK.

## IV.    Analysis

At the onset, neither this Order nor any other determination in this action will decide or even address whether the UDC has an ownership interest or license in, or any other right to make use of, the Circle.  The UDC is not a party to this action, KTK does not assert that it has been granted any right to share in any alleged license[4] or ownership interest, and KTK has presented no authority establishing how it would have standing to assert rights under a license or ownership interest it does not possess.  Moreover, the Court agrees with the City (see Doc. 67 at 7) that a determination of such an issue is unnecessary to the disposition of the claims presented in this action.  As such, the Court will not address any of the parties' extensive arguments related to this issue.  Rather, the issue presently before the Court is whether KTK's due process rights were violated.

> The Due Process Clause of the Fourteenth Amendment provides no state "shall ... deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend XIV, § 1. "Procedural due process rules are meant to protect persons not from the deprivation, but from the mistaken or unjustified deprivation of life, liberty, or property." Carey v. Piphus, 435 U.S. 247, 259, 98 S. Ct. 1042, 1050, 55 L. Ed. 2d 252 (1978). "In this circuit, a § 1983 claim alleging a denial of procedural due process requires proof of three elements: (1) a deprivation of a constitutionally-protected liberty or property interest; (2) state action; and (3) constitutionally-inadequate process." Grayden v. Rhodes, 345 F.3d 1225, 1232 (11th Cir. 2003) (citing Cryder v. Oxendine, 24 F.3d 175, 177 (11th Cir. 1994)).

---

[4] The Court notes that, under Alabama law, "a license is by its very nature personal; and, being a personal right, it is not an interest which attaches to or runs with the land, nor can it be assigned, conveyed or inherited. Neither can it ripen into an easement by prescription, however long continued." Wehby v. Turpin, 710 So. 2d 1243, 1251 (Ala. 1998) (quotation & alterations omitted).

Arrington v. Helms, 438 F.3d 1336, 1347-48 (11th Cir. 2006).[5]  Accord Catron v. City of St.

Petersburg, 658 F.3d 1260, 1266 (11th Cir. 2011).  See also Greenbriar Vill., L.L.C. v. Mountain

Brook, City, 345 F.3d 1258, 1264 (11th Cir. 2003) ("When courts analyze a procedural due

process claim . . . they variously examine three things: (1) whether there is enough of a property

interest at stake to be deemed protectable; (2) the amount of process that should be due for that

protectable right; and (3) the process actually provided, be it before or after the deprivation."

(quotation marks and footnote omitted)).  "If the government fails to comply with the dictates of

the Due Process Clause, the aggrieved party can seek compensatory damages and equitable relief

under 42 U.S.C. § 1983."  Grayden v. Rhodes, 345 F.3d 1225, 1232 (11th Cir. 2003) (citing

McKinney v. Pate, 20 F.3d 1550, 1555, 1557 (11th Cir. 1994) (en banc)).

---

[5]      In its Reply, KTK objects to any application of the procedural due process analysis in Grayden v.
Rhodes, arguing that 1) Grayden was "superceded by" Greenbriar Village v. Mountain Brook, City, 345
F.3d 1258 (11th Cir. 2003), and 2) Greenbriar, rather than Grayden, is the "law of the case," as Greenbriar
but not Grayden was applied by the Magistrate Judge to KTK's substantive due process claims in his
Report and Recommendation (Doc. 40), with the Court subsequently adopting that analysis (Doc. 44).
(Doc. 73 at 2.  See also Doc. 59 at 15-16 "Accordingly, by adoption, the Magistrate Judge's discussion of
KTK's procedural due process claim and applicable law . . . takes on the timbre of 'law of the case' . . .").
        KTK's first argument in this regard is inconsistent with well-established Eleventh Circuit
precedent.   Grayden was issued September 17, 2003, while Greenbriar was issued a day later, on
September 18, 2003.  Both opinions were issued by 3-judge panels.  Therefore, to any extent the opinions
may conflict (and the Court is not suggesting that they do), the later-issued Greenbriar could not have
"superceded" Grayden.  See, e.g., McGinley v. Houston, 361 F.3d 1328, 1331 (11th Cir. 2004) ("The
Eleventh Circuit follows the absolute rule of the Fifth Circuit that 'a prior decision of the circuit (panel or
en banc) [cannot] be overruled by a panel but only by the court sitting en banc.' " (quoting Bonner v. City
of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981)).
        KTK's second argument is also without merit.  "Under the law of the case doctrine, an issue
decided at one stage of a case is binding at later stages of the same case.  Notably, however, a court's
previous rulings may be reconsidered as long as the case remains within the jurisdiction of the district
court.  Consequently, law of the case applies only where there has been a final judgment."  Aldana v. Del
Monte Fresh Produce N.A., Inc., 578 F.3d 1283, 1288-89 (11th Cir. 2009) (internal citations and
quotations omitted)).  See also Lanier Const., Inc. v. Carbone Props. of Mobile, LLC, 253 F. App'x 861,
863 (11th Cir. 2007) ("We have held that if a district court decision is interlocutory and subject to
reconsideration, any constraints of the law-of-the-case doctrine are inapplicable. See Gregg v. U.S. Indus.,
Inc., 715 F.2d 1522, 1530 (11th Cir. 1983) ('Ordinarily law of the case applies only where there has been
a final judgment and not to interlocutory rulings.').").  As no final judgment has issued in this action, the
Court is not bound by the "law of the case" doctrine.

KTK argues there is no genuine issue of material fact that the City violated its procedural due process rights by depriving it of a constitutionally-protected property interest when it suspended/revoked the building permit issued to KTK for the Circle refurbishing project without giving KTK a chance to be heard prior to the decision and without providing a means to challenge it. [6]

### a.     **Deprivation of a Constitutionally Protected Property Interest**

> Under the first element of the <u>Grayden</u> test, [the Court] must consider whether [KTK] ha[s] shown not only a constitutionally-protected property interest, but also a governmental deprivation of that constitutionally-protected property interest. <u>See Grayden</u>, 345 F.3d at 1232 (stating the plaintiff-tenants satisfied the first element of the <u>Grayden</u> test because they (1) enjoyed a constitutionally-protected property interest in continued residency at their apartments and (2) were deprived of that interest upon eviction). Property interests stem not from the Constitution, but from such sources as statutes, regulations, ordinances, and contracts. <u>See Bd. of Regents of State Colls. v. Roth</u>, 408 U.S. 564, 576–77, 92 S. Ct. 2701, 2708–09, 33 L. Ed. 2d 548 (1972). Whether these sources create a property interest must be decided by reference to state law. <u>Id.</u> at 577, 92 S. Ct. at 2709.

<u>Arrington</u>, 438 F.3d at 1348 (footnote omitted). Additionally, "[a]lthough the underlying substantive interest is created by an independent source such as state law, *federal constitutional law* determines whether that interest rises to the level of a legitimate claim of entitlement protected by the Due Process Clause. Resolution of the federal issue begins, however, with a determination of what it is that state law provides." <u>Town of Castle Rock, Colo. v. Gonzales</u>,

---

[6] KTK also appears to assert that it is due constitutionally adequate process as to any revocation of the Certificate of Appropriateness issued by the Historic Commission. However, the Certificate of Appropriateness reflects that it was issued to the UDC and the FOF (Doc. 58-3 at 2), not KTK. KTK does not assert otherwise in its briefing (<u>see, e.g.</u>, Doc. 60 at 7-8 ("Prior to August 3, 2012, the Selma Chapter 53, UDC, and FOF, submitted to the Selma Historic Development Commission an application and request for a Certificate of Appropriateness . . . On August 3, 2012, the Selma Historic Development Commission issued a Certificate of Appropriateness to both UDC and FOF . . .") and does not attempt to explain how it would have a constitutionally protected property interest in a certificate that was not issued to it.

545 U.S. 748, 757 (2005) (internal citations and quotations omitted).

Conflicting arguments have been presented over whether the Selma City Council even has the authority to suspend or revoke a lawfully obtained building permit. KTK contends "that the vote of the City Council on September 25, 2013, was an *ultra vires* vote[,]" asserting that "[t]here is absolutely *nothing* by statute or ordinance which permits the Selma City Council to revoke or suspend a building permit where the underlying C[ertificate of ]A[ppropriateness] has never been revoked or suspended, and the Building Inspector has never revoked or suspended the permit or issued a stop work order." (Doc. 59 at 12). In support of this argument, KTK cites to the deposition testimony of several City officials who testify either that the City Council does not possess such a power or that they have never known it to take such an action. (Id. at 12-13). KTK also cites to the deposition testimony of the City Council President purportedly admitting "that it was an illegal act for the City Council to have entertained and voted on a motion regarding a Confederate Circle issue on the evening of September 25th, which was not on the agenda as published . . ." (Id. at 13-14).

In response, the City points to testimony by the chairman of the Selma Historic Development Commission stating that the City Council can override "its approval" – "approval" presumably including Certificates of Appropriateness, which are not at issue in this action, see n.6. (Doc. 67 at 8). The City also cites to Ala. Code § 11-43-56 ("Except as otherwise provided in this title, the council shall have the management and control of the finances and all of the property, real and personal, belonging to the city or town.") and § 11-45-1 (see *infra*).

To the extent both parties present witness testimony as evidence of what the City Council and other City officials can or cannot legally do, such testimony constitutes inadmissible legal

conclusions that will not be considered.  See Montgomery v. Aetna Cas. & Sur. Co., 898 F.2d

1537, 1541 (11th Cir. 1990) ("A witness . . . may not testify to the legal implications of conduct;

the court must be the jury's only source of law."); United States v. Long, 300 F. App'x 804, 814

(11th Cir. 2008) ("An expert witness may not testify as to his opinion regarding ultimate legal

conclusions." (citing Montgomery)).   If, as KTK argues, the City Council in fact had no

authority to suspend or revoke KTK's building permit, then it would appear that the Council's

vote to do so constitutes a void and unenforceable act, making it debatable whether the vote

actually "deprived" KTK of the building permit.[7]   However, as the City points out, Alabama law

provides that

      [m]unicipal corporations may from time to time adopt ordinances and resolutions

_____

[7]    Cf. Picard v. Members of Employee Ret. Bd. of Providence, 275 F.3d 139, 144 (1st Cir. 2001) ("[T]he Supreme Court of Rhode Island has repeatedly held that a CBA that is not ratified by the City Council is void and unenforceable.  Given this clear precedent from the state's highest court, we find no basis for concluding that plaintiffs were deprived of a property or contract right in violation of the Constitution." (internal citations omitted)); Kerley Indus., Inc. v. Pima Cnty., 785 F.2d 1444, 1446 (9th Cir. 1986) ("While plaintiff had a sufficient property interest to invoke procedural due process protections, it has suffered no deprivation. The _only_ act defendant cites in support of its contention that it was deprived of property without due process is the November 28, 1984, letter from the Deputy Air Quality Inspector informing it that the permit was "null and void." However, as the record reflects and as appellant's counsel conceded, the Deputy Air Quality Control Officer lacked the authority to revoke the permit; the Board alone could do so. Ariz. Rev. Stat. Ann. § 36–784.04 (1974). Therefore, Kerley was entitled to begin operating under its permit on December 1, 1984. Kerley's mistaken belief that the Deputy Air Quality Control Officer's letter constituted an annulment of its permit does not give that letter operative legal effect and therefore cannot constitute the basis of a claim of deprivation of property without due process."); Rushing v. City of Georgiana, 374 So. 2d 253, 255-56 (Ala. 1979) ("(1) [G]ranting compensation to the employee of a municipality is a legislative function and legislative functions require adoption of an ordinance; and (2) since [Ala. Code ]s 11-43-7 requires an ordinance for prescription of salaries or fees, that section would also require an ordinance to prescribe disability compensation for a municipal employee. In this case since the action taken by the City, regarding Mr. Rushing, was not an ordinance but a mere motion, or at the most a resolution, the motion passed by the City to pay Rushing fifty dollars a week was void Ab initio.  Therefore, no cause of action accrued to Rushing because of the entry of the minutes, here under consideration, of the Council's meeting on 5 November 1962.  As a matter of law, there was no valid claim against the City.").

    KTK has not alleged that the City has made any efforts to enforce its ordinance/resolution/motion since enacting it, likely because KTK does not appear to have attempted to resume work on the Circle since then.

not inconsistent with the laws of the state to carry into effect or discharge the powers and duties conferred by the applicable provisions of this title and any other applicable provisions of law and to provide for the safety, preserve the health, promote the prosperity, and improve the morals, order, comfort, and convenience of the inhabitants of the municipality, and may enforce obedience to such ordinances.

Ala. Code § 11-45-1.  Moreover,

"Although municipalities exercise 'such power ... as is conferred upon [them] by law,' a municipality need not predicate its every action upon some specific express grant of power. Alabama's cities possess certain implied powers that derive from the nature of the powers expressly granted to them by the legislature." Wilkins v. Dan Haggerty & Assocs., Inc., 672 So. 2d 507, 509 (Ala. 1995). Indeed, "[i]t is elementary that, in addition to the powers expressly conferred on them by the legislature, municipal corporations have, by implication, all powers reasonably necessary to the carrying out of those powers expressly granted, and also, as incidental powers, all powers necessary for carrying out the corporate purposes." City of Bessemer v. Birmingham Elec. Co., 248 Ala. 345, 354, 27 So.2d 565, 573 (1946).

Peak v. City of Tuscaloosa, 73 So. 3d 5, 12 (Ala. Crim. App. 2011).  As such,

"It is, without question, a settled rule of law in Alabama that:

" 'municipal ordinances are presumed to be valid and reasonable, to be within the scope of the powers granted municipalities to adopt such ordinances, and are not to be struck down unless they are clearly arbitrary and unreasonable.' Cudd v. City of Homewood, 284 Ala. 268, 270, 224 So.2d 625 (1969)."

Hall v. City of Tuscaloosa, 421 So.2d 1244, 1247 (Ala. 1982).  It is therefore axiomatic that "an ordinance enacted by a local governing body 'is presumed reasonable and valid, and that the burden is on the one challenging the ordinance to clearly show its invalidity.' " Brown v. Board of Educ. of Montgomery, 863 So. 2d 73, 75 (Ala. 2003) (quoting Jefferson County v. Richards, 805 So.2d 690, 706 (Ala.2001)).

St. Clair Cnty. Home Builders Ass'n v. City of Pell City, 61 So. 3d 992, 1007-08 (Ala. 2010).[8]

---

[8] The City Council appears to have suspended/revoked KTK's license pursuant to a vote on a motion. Alabama case law has distinguished between a city council's "motion" or "resolution" and its "ordinances."  See Rushing, 374 So. 2d at 254-55 ("[M]otion passed by a City Council is essentially the same as the Council passing a resolution. McQuillin, Municipal Corporations, (3rd Ed. 1968) s 15.08.

Alabama law provides that "[a]ll legislative powers and other powers granted to cities and towns shall be exercised by the council, **except those powers conferred on some officers by** law or **ordinance**." Ala. Code § 11-43-43 (emphasis added). A municipal "council may adopt building laws and may employ building inspectors to see that the laws are not violated and that the plans and specifications for buildings are not in conflict with the ordinances of the city or town . . ." Ala. Code § 11-43-59. KTK has presented to the Court City Ordinance No. 02-9899, passed by the City Council on September 13, 1999, which adopts "in all respects", *inter alia*, the "Standard Building Code - 1997 Edition." (Doc. 63-1 at 2). The "Standard Building Code – 1997 Edition" provides for the establishment of "a department to be called the building department[,]" with "the person in charge [to] be known as the building official. (Id. at 5, § 102.1). "The building official is . . . authorized and directed to enforce the provisions of th[e] code" and "to render interpretations of th[e] code, which are consistent with its spirit and purpose." (Id., § 103.1). This includes the issuance of building permits as set out in Section 104 of the "Standard Building Code – 1997 Edition." This code sets forth the standards and procedures for the building official to issue permits. (Id. at 6-9). Moreover, Ordinance No. 02-9899 specifies that "within [the referenced codes], when reference is made to the duties of a

---

There is, however, a great distinction between a resolution and an ordinance . . . Unfortunately, sometimes the word 'ordinance' is used interchangeably with the word 'resolution,' but this does not negate the distinction between the two."). However, either "resolutions" or "ordinances" can constitute the law of a municipality, unless a specific mode of enactment is required. See Tutwiler Drug Co., Inc. v. City of Birmingham, 418 So. 2d 102, 106 (Ala. 1982) ("We find . . . that Alabama case law, consistent with th[e] statutory mandate[ of Ala. Code § 11-45-1], permits the enactment of laws by ordinance or resolution in the absence of a statutory requirement for a specific mode of enactment. Tucker v. City of Robertsdale, 406 So. 2d 886 (Ala. 1981). See, also, McQuillen, Municipal Corporations, Vol. 5 (3rd ed., 1981), § 15.06."). Accord Scott v. Coachman, 73 So. 3d 607, 610 (Ala. 2011)

certain official named therein, that designated official of City of Selma who has duties corresponding to those of the named official in said code shall be deemed to be the responsible official insofar as enforcing the provisions of said code are concerned." (Id. at 2).

The Alabama Court of Civil Appeals recently stated that a "[c]ity is required to follow the procedures set out in its own ordinances." Bd. of Zoning Adjustment of City of Trussville v. Tacala, Inc., No. 2120132, 2013 WL 1490605, at *4 (Ala. Civ. App. Apr. 12, 2013). However, the Court does not read Ordinance No. 02-9899 as clearly divesting the City Council of any authority with regard to building permits, at least in matters related to "the management and control of . . . all of the property, real and personal, belonging to the city or town." Ala. Code § 11-43-56. Moreover, by asserting that the City Council did in fact have the legal authority to suspend or revoke KTK's building permit, the City appears not to dispute that a "deprivation" has occurred. In addition, the actions of the City Council, considered in conjunction with the actions of Chief Riley in threatening to arrest KTK employees if they resumed work on the Circle (actions that Selma does not contest were taken at the behest of Selma's mayor), could be said to constitute a "deprivation" through interference with KTK's use of the building permit.

The City does contest whether KTK has a constitutionally protected property interest in the building permit. "[N]o procedural due process claim exists until a sufficiently certain property right under state law is first shown." Greenbriar, 345 F.3d at 12645. In arguing whether KTK has a constitutionally-protected property interest in the building permit for due process purposes, both KTK and the City cite to Greenbriar, 345 F.3d 1258, in which the plaintiff landowner also asserted such a property interest arising from a land-use permit issued by an Alabama municipality. In analyzing the landowner's § 1983 procedural due process claim,

particularly with regard to the "constitutionally-protected property interest" element, the Eleventh Circuit applied the reasoning of the Second Circuit in Natale v. Town of Ridgefield, 170 F.3d 258, 263 (2d Cir. 1999); for instance, stating:

> Before a plaintiff seeks to prove that a state official's denial of a permit deprived him of a property right in the permit in violation of the standards of substantive due process ... he must first establish that he has a federally protectable property right in the permit. This requires a demonstration that [at the time of the municipality's alleged due process violation,] he had a *clear entitlement* to the permit under state law.

Greenbriar, 345 F.3d at 1264 n.6 (quoting Natale, 170 F.3d at 263 (emphasis added)).[9]

As to "clear entitlement," "[t]he determining factor . . . may be whether the permit-issuing government authority lacks discretion to deny the permit on which the plaintiff bases his property right. [Natale, 170 F.3d] at 263 ("[E]ntitlement turns on whether the issuing authority lacks discretion to deny the permit, i.e., is required to issue it upon ascertainment that certain objectively ascertainable criteria have been met"); see also Crown Point I, L.L.C. v. Intermountain Rural Elec. Ass'n, 319 F.3d 1211, 1217 (10th Cir. 2003) ("[W]hen a party challenges a land use decision by a governing body on due process grounds, the proper inquiry is whether that body had limited discretion in granting or denying a particular zoning or use application")." Id. at 1266.

The Eleventh Circuit set out the basis for the landowner's asserted property interest in Greenbriar as follows:

---

[9] Though recognizing that "Natale's rationale traveled on a substantive due process claim," the Eleventh Circuit "conclude[d] that it is appropriately applied to the procedural due process claim advanced" in Greenbriar, "as [it] s[aw] no supportable distinction directing [it] otherwise. The common and key thread to [Greenbriar and Natale wa]s the uncertainty of the property right, thus rendering it unprotectable under established federal due process doctrine." Greenbriar, 345 F.3d at 1266.

Both Greenbriar and the district court focused on the City code-specifically, the code's gaps and the City's subsequent gap-repair efforts-to support the existence of Greenbriar's estoppel-based property right. See Greenbriar Village[, L.L.C. v. City of Mountain Brook], 202 F. Supp. 2d [1279,] 1290[ (N.D. Ala. 2002)] (finding that Greenbriar's "property rights under applicable Alabama law rests in the doctrine of equitable estoppel"); id. at 1291-92 (finding that Greenbriar made expenditures in reliance on the City's land-disturbance permit and that Greenbriar did not obtain the permit in bad faith). There is no dispute that Greenbriar exploited an admitted gap in the City's code, ultimately obtaining from the district court a de facto commercial zoning change merely because the City was lax in maintaining a gap in its code, and, later, a little too tricky in notifying Greenbriar of its legislative efforts to eliminate it by sending notice to a Greenbriar principal, rather than to Greenbriar at its corporate address.

Greenbriar thus advanced a property right derived from: (1) the City's error in creating a gap in its code; (2) the City's failure to timely halt Greenbriar's exploitation of it; (3) Greenbriar's gamble (by engaging in commercial-scale clearing of residentially zoned land) that it one day would successfully pressure the City to rezone the subject land to its liking; (4) Greenbriar's exploitation of an open-ended (time-wise) land-disturbance permit to artificially create "detrimental reliance" on a future-but-not-guaranteed commercial rezoning; and (5) the City's legally inartful efforts to repair the gap (efforts which led to this § 1983 action and the lower court's permanent injunction). All of that occurred on a land-disturbance permit that was so open-ended that Greenbriar itself conceded that courts should simply fill in its gaps (that the Permit was valid for "a reasonable time"). See id. at 1298.

Greenbriar therefore, at most, held an uncertain property right when the City violated its zoning-notice procedures. It was not "certain" until after the alleged due process deprivation occurred. Indeed, the "by-estoppel" property right was not even recognized until the district court announced it, and even at that on legal grounds different from those Greenbriar itself proffered. See id. at 1290. ("Although Greenbriar also asserts that its property rights spring from the issuance to it of a [state pollution-discharge] Permit and because of its inherent 'bundle of property rights,' ... this court finds that the most solid basis for Greenbriar's vested property rights under applicable Alabama state law rests in the doctrine of equitable estoppel."). Further, Greenbriar relied on land use procedures to derive its property right.

Id. at 1265 (footnote omitted).

The Eleventh Circuit ultimately concluded in Greenbriar that the landowner "lacked a

federally protectable property interest[,]" as its " 'entitlement to the permit[ ] sought turned ultimately on the resolution of the parties' [ ] law dispute as to whether [Greenbriar] had ... rights.' Natale, 170 F.3d at 263; see also id. at 264 (property owner lacked protectable property interest where the law became clear only after a state court's 'refined analysis of two state statutes and a state Supreme Court decision')." Id. at 1266.

Greenbriar appears to be consistent with a more recent statement by the Eleventh Circuit regarding what constitutes a constitutionally protected property interest for purposes of procedural due process:

> "[P]roperty interests subject to procedural due process protection are not limited by a few rigid, technical forms. Rather, property denotes a broad range of interests that are secured by existing rules or understandings." Perry v. Sindermann, 408 U.S. 593, 601, 92 S. Ct. 2694, 2699, 33 L. Ed. 2d 570 (1972) (citation omitted) (internal quotation marks omitted). An individual can have a protected property interest in a government benefit when he has "a legitimate claim of entitlement to it." Bd. of Regents of State Colls. v. Roth, 408 U.S. 564, 577, 92 S. Ct. 2701, 2709, 33 L. Ed. 2d 548 (1972). The claim of entitlement must come from an independent source. Id. ("Property interests ... are not created by the Constitution ... [but] by existing rules or understandings that stem from an independent source ...."); Sindermann, 408 U.S. at 602 n.7, 92 S. Ct. at 2700 n.7. The independent source can be a statute, see Goss v. Lopez, 419 U.S. 565, 572–73, 95 S. Ct. 729, 735, 42 L. Ed. 2d 725 (1975); a regulation, see Glenn v. Newman, 614 F.2d 467, 471–72 (5th Cir. 1980), overruled on other grounds, Monroe Cnty., Fla. v. U.S. Dep't of Labor, 690 F.2d 1359 (11th Cir. 1982); an express or implied contract, see Sindermann, 408 U.S. at 601–02, 92 S. Ct. at 2699–2700; or a mutually explicit understanding. Id. at 602–03, 92 S. Ct. at 2700.

> "The hallmark of property ... is an individual entitlement grounded in state law, which cannot be removed except 'for cause.' " Logan v. Zimmerman Brush Co., 455 U.S. 422, 430, 102 S. Ct. 1148, 1155, 71 L. Ed. 2d 265 (1982); see Barry v. Barchi, 443 U.S. 55, 65, 99 S. Ct. 2642, 2649, 61 L. Ed. 2d 365 (1979); Memphis Light, Gas & Water Div. v. Craft, 436 U.S. 1, 9, 98 S. Ct. 1554, 1560, 56 L. Ed. 2d 30 (1978); Glenn, 614 F.2d at 471. The independent source need not use the phrase "for cause" so long as the parties understood their agreement would have that effect. See Peterson v. Atlanta Hous. Auth., 998 F.2d 904, 914 (11th Cir. 1993).

Barnes v. Zaccari, 669 F.3d 1295, 1303 (11th Cir. 2012).

As adopted by City Ordinance No. 02-9899, Section 104 of the "Standard Building Code – 1997 Edition" sets forth the standards and procedures for the building official to issue permits. (Id. at 6-9). Section 104.1.3 states that "[a] building . . . permit shall carry with it the right to construct or install the work . . ." (Id. at 6). Thus, the City's ordinance creates a "right to construct or install []work" upon the issuance of a building permit. Moreover, section 104.4.2 states that "[i]f the building official is satisfied that the work described in an application for a permit and the contract documents field therewith conform to the requirements of the technical codes and other pertinent laws and ordinances, he **shall issue** a permit to the applicant." (Id. at 8 (emphasis added)). Thus, "the permit-issuing government authority" – i.e. the Building Inspector – "lacks discretion to deny the permit" so long as an applicant properly requests one. Greenbriar, 345 F.3d at 126.

As to KTK's building permit, the City makes the conclusory assertion that KTK's "rights at issue were not clear at the time of the issuance of the permit, and even today have not been resolved." (Doc. 67 at 7). As Greenbriar and Natale make clear, "uncertainty" as to a party's rights under a land-use permit is a key consideration in determining whether a "constitutionally-protected property interest" arises from the permit. However, the "uncertainty" to which the City refers appears to be that surrounding the ownership of and right to use the Circle, rather than any "uncertainty" as to KTK's right to be issued a building permit under the applicable laws.[10]

_____

[10] The City cites to Marine One, Inc. v. Manatee Cnty., 898 F.2d 1490, 1492 (11th Cir. 1990), and to cases cited within that opinion, for the proposition that "no property interest is created by permit or license to use public lands." (Doc. 57 at 12-13). Marine One, involving the rescission of marine construction permits in Florida, discussed whether such permits give rise to a protectable property interest

KTK has presented undisputed evidence indicating that it was duly issued the building permit by the City's Department of the Building Inspector after complying with applicable City ordinances, for the stated purpose of "rebuilding N B Forrest monument." (Doc. 58-3 at 11, Building Permit). The City has offered no evidence or argument that the building permit was improperly issued or that KTK was not otherwise entitled to be issued it.[11]  Accordingly, because KTK has presented sufficient undisputed evidence of " 'a *clear entitlement* to the permit under state law' ", the Court finds no genuine issue of material fact that KTK has " 'a federally protectable property right in the permit.' " Greenbriar, 345 F.3d at 1264 n.6 (quoting Natale, 170 F.3d at 263).

### b. State action

No party disputes that "municipalities may . . . be held liable for the execution of a governmental policy or custom." Scala v. City of Winter Park, 116 F.3d 1396, 1399 (11th Cir.

---

in the context of a constitutional Takings Clause claim.  There, the court held: "[I]t is clear from . . . Florida cases that revocation of [a permit to perform activities on public land] would not constitute a taking of property." Marine One, 898 F.2d at 1492.  However, a "due-process claim does not depend on whether revocation of [a] permit constituted a compensable taking. See Fed. Lands Legal Consortium ex rel. Robart Estate v. United States, 195 F.3d 1190, 1196–97 (10th Cir. 1999) (although grazing permit is not 'property' under the Takings Clause, it may be a property interest protected by Due Process Clause (internal quotation marks omitted)); Burns v. Pa. Dep't of Corr., 544 F.3d 279, 285–86 n.3 (3rd Cir. 2008) (meaning of 'property' under Due Process Clause is 'a distinct inquiry' from its meaning under Takings Clause (internal quotation marks omitted))."  Schanzenbach v. Town of La Barge, 706 F.3d 1277, 1283 (10th Cir. 2013).

[11] The Alabama Supreme Court has held that, "[w]here a building permit is issued in violation of [a] zoning ordinance, it is invalid, and the permittee acquires no vested rights thereunder and this although the permittee has incurred expense in connection therewith and in reliance thereon.  And one to whom a building permit has been illegally issued cannot successfully invoke the doctrine of estoppel so as to preclude the municipality from revoking the permit, notwithstanding the fact that the permittee may have acted in good faith and may have expended money or incurred obligation in reliance upon the permit." Bd. of Zoning Adjustment for City of Lanett v. Boykin, 265 Ala. 504, 509 (1957) (citation omitted).  See also Moore v. Pettus, 260 Ala. 616, 625 (1954) ("The building permit which was issued to Mr. Moore was invalid, hence he acquired no vested rights thereunder although he has incurred expense in connection with the extension to and improvement of his store building.").

1997) (citing <u>Monell v. Dep't of Social Servs.</u>, 436 U.S. 658 (1978)).  Moreover, the Supreme

Court has held that "a municipality may be liable under § 1983 for a single decision by its

properly constituted legislative body—whether or not that body had taken similar action in the

past or intended to do so in the future—because even a single decision by such a body

unquestionably constitutes an act of official government policy."  <u>Pembaur v. City of Cincinnati</u>,

475 U.S. 469, 480 (1986).  The Court finds sufficient record evidence showing no genuine issue

of material fact that the City Council's vote to suspend/revoke the building permit and the

actions of Chief Riley constitute "state action" by the City.

### c.  Constitutionally adequate process

The Due Process Clause requires, at a minimum, "notice and the opportunity to be heard incident to the deprivation of life, liberty or property at the hands of the government." <u>Grayden v. Rhodes</u>, 345 F.3d 1225, 1232 (11th Cir. 2003). The lack of a meaningful opportunity to be heard is at the core of a due process claim because "the deprivation by state action of a constitutionally protected interest in 'life, liberty, or property' is not in itself unconstitutional; what is unconstitutional is the deprivation of such an interest *without due process of law.*" <u>Zinermon v. Burch</u>, 494 U.S. 113, 125, 110 S. Ct. 975, 983, 108 L. Ed. 2d 100 (1990) (emphasis in original) (quoting <u>Parratt v. Taylor</u>, 451 U.S. 527, 537, 101 S. Ct. 1908, 1913, 68 L. Ed. 2d 420 (1981)).

. . .

"Although the Due Process Clause generally requires notice and an opportunity to be heard *before* the government seizes one's property ... the Supreme Court 'has rejected the proposition that ... the State [must always] provide a hearing prior to the initial deprivation of property.' " <u>Reams v. Irvin</u>, 561 F.3d 1258, 1263 (11th Cir. 2009) (emphasis in original) (internal citation omitted) (quoting <u>Parratt</u>, 451 U.S. at 540–41, 101 S. Ct. at 1915–16); <u>see also</u> <u>Hudson v. Palmer</u>, 468 U.S. 517, 104 S. Ct. 3194, 82 L. Ed. 2d 393 (1984).

"[T]he feasibility of predeprivation procedures [i]s the central question in determining [whether predeprivation procedures must be provided]." <u>Rittenhouse v. DeKalb Cnty.</u>, 764 F.2d 1451, 1455 (11th Cir. 1985); <u>see also</u> <u>Carcamo v. Miami–Dade Cnty.</u>, 375 F.3d 1104, 1105 n.4 (11th Cir. 2004). So long as the

State provides adequate post-deprivation remedies, "due process d[oes] not require pre-deprivation hearings where the holding of such a hearing would be impracticable, that is, where the deprivation is the result of either a negligent or an intentional deprivation of property." McKinney v. Pate, 20 F.3d 1550, 1562–63 (11th Cir. 1994) (en banc).

Pre-deprivation process is impractical "where a loss of property is occasioned by a random, unauthorized act by a state employee, rather than by an established state procedure," because "the state cannot know when such deprivations will occur." Hudson, 468 U.S. at 532, 533, 104 S. Ct. at 3203. These "established state procedure[s]" are typically established for the *purpose* of depriving citizens of their property. Rittenhouse, 764 F.2d at 1455 . . .

Nat'l Ass'n of Bds. of Pharmacy v. Bd. of Regents of the Univ. Sys. of Ga., 633 F.3d 1297, 1316-17 (11th Cir. 2011).

In Count 8 of its Amended Complaint, KTK alleged:

The minutes of the September 25, 2012, City Council meeting show that the suspension/revocation of the building permit was intended to be a final action of the City Council "until a Court ruling has been made as it relates to the use/ownership of the [Confederate Circle] property". Therefore, KTK has been left with no administrative remedy and the City has deferred to judicial action to resolve this controversy . . .

(Doc. 28 at 13, ¶ H).

The City did not address the element of constitutionally adequate process in its response to KTK's motion for summary judgment, finding it "need not be reached" due to its belief that KTK could not establish other elements.[12]  (Doc. 67 at 10).  The undisputed record evidence

---

[12]     In its brief in support of its own motion for summary judgment, the City conclusively asserts that "the City Council's action in suspending the construction and permit was a legislative act, and the legislative process surrounding that act provided [KTK] 'with all the process constitutionally due.' 75 Acres, LLC v. Miami-Dade County, Fla., 338 F.3d 1288, 1297 (11th Cir. 2003); O'Neal Homes, Inc. v. City of Orange Beach, 333 F. App'x 428, 430 (11th Cir. 2009)."    (Doc. 57 at 14).  With regard to this argument, the Eleventh Circuit noted:

The Supreme Court's statements in Londoner[ v. City & County of Denver, 210 U.S. 373, 28 S. Ct. 708, 52 L. Ed. 1103 (1908)] and Bi-Metallic[ Investment Co. v. State

Board of Equalization, 239 U.S. 441, 36 S. Ct. 141, 60 L. Ed. 372 (1915)] years ago have served as the foundation for a strikingly uniform approach to procedural due process. Under that approach, if government action is viewed as legislative in nature, property owners generally are not entitled to procedural due process. Or, as one set of commentators has summarized, "When the legislature passes a law which affects a general class of persons, those persons have all received procedural due process-the legislative process. The challenges to such laws must be based on their substantive compatibility with constitutional guarantees." Ronald E. Rotunda & John E. Nowak, *Treatise on Constitutional Law* § 17.8 (3d ed.1999). By contrast, if government conduct is viewed as adjudicative in nature, property owners may be entitled to procedural due process above and beyond that which already has been provided by the legislative process. When an adjudicative act deprives an individual of a constitutionally-protected interest, procedural due process is implicated . . .

. . .

"[T]he line between legislation and adjudication is not always easy to draw." LC & S, Inc. v. Warren County Area Plan Comm'n, 244 F.3d 601, 603 (7th Cir. 2001). In our attempts to draw that line, we will not capitulate to the label that a government body places on its action. Coniston Corp. v. Vill. of Hoffman Estates, 844 F.2d 461, 468 (7th Cir. 1988) ("It is not labels that determine whether action is legislative or adjudicative."). Although this circuit has not articulated a test for distinguishing between legislative and adjudicative action, two federal courts of appeals have done so. The Second Circuit focuses on the function performed by the decisionmaker to make the determination. Thomas v. City of New York, 143 F.3d 31, 36 n.7 (2d Cir. 1998). By contrast, the Seventh Circuit focuses on the generality and prospectivity of government action to decide whether a government action is legislative in nature. LC & S, 244 F.3d at 604 ("Not the motive or stimulus, but the generality and consequences, of an enactment determine whether it is really legislation or really something else.") . . .

. . .

[T]he legislative process surrounding the enactment of [a law] provide[s] [a plaintiff] with all the process constitutionally due. Rogin v. Bensalem Township, 616 F.2d 680, 693-94 (3rd Cir. 1980) ("To provide every person affected by legislation the various rights encompassed by procedural due process ... would be inconsistent with the structure of our system of government.... [T]he general theory of republican government is not due process through individual hearings and the application of standards of behavior, but through elective representation, partisan politics, and the ultimate sovereignty of the people to vote out of office those legislators who are unfaithful to the public will."); LC & S, 244 F.3d at 602-03 ("Legislation is prospective in effect and, more important, general in its application.... The right to notice and a hearing, the essence of [our modern concept of due process of law], are substitutes for the prospectivity and generality that protect citizens from oppression by legislators and thus from the potential tyranny of electoral majorities.").

75 Acres, LLC v. Miami-Dade Cnty., Fla., 338 F.3d 1288, 1294, 1296, 1298 (11th Cir. 2003) (n.11: "We decline to adopt a hard-and-fast rule for distinguishing between legislative and adjudicative action. The parties have not urged us to adopt such a rule, nor have they briefed the relative merit of the tests adopted by the Second and Seventh Circuits. Moreover, as we note below, our decision in this case would be the

shows no genuine issue of material fact that KTK was provided no pre-deprivation process. The first KTK learned of Chief Riley's intervention was when he confronted KTK's employees at the Circle after the municipal elections had taken place. As to the council vote to suspend/revoke KTK's building permit, the undisputed evidence shows that the issue was raised for the first time at the September 25, 2012 council meeting, where the vote was taken; that the issue was not included on the advance agenda for the meeting; and that KTK was not otherwise notified that such an issue would be raised, only learning of the action after the vote was taken. Accordingly, it could not be heard on or otherwise contest the deprivation before it occurred.[13]

Before determining if post-deprivation procedures can provide adequate process, a court

---

same under either the Second Circuit's test or the Seventh Circuit's test.") (modification in first sentence added).

The City provides no analysis under any of the tests articulated in 75 Acres, LLC to support its argument that the suspension/revocation of KTK's building permit was a legislative act. Certainly, the City cannot reasonably argue that the City Council's vote to suspend/revoke KTK's building permit, or even to halt all work on the Circle, was either a general or prospective act. See Beaulieu v. Ala. Onsite Wastewater Bd., No. 2:08-CV-432-MEF, 2009 WL 692190, at *4 (M.D. Ala. Mar. 13, 2009), aff'd, 373 F. App'x 3 (11th Cir. 2010) ("An action is legislative when a governmental body enacts a law of general applicability in its legislative capacity. Bi–Metallic, 239 U.S. at 446 (viewing a State Board of Equalization order which required an 'across-the-board' increase in assessed value of taxable property and applied equally to all landowners in Denver as a legislative act). A government action is adjudicative when a law is not generally applicable; for example, when a city council makes determinations based on individualized grounds. Londoner, 210 U.S. at 380.")

Accordingly, the Court rejects the City's argument that its actions constitute a legislative act.

[13] In an unpublished opinion, the Ninth Circuit held that "[w]hen a zoning board decides to revoke a permit, due process requires notice to the permittee, a hearing, proper reasons for the revocation, and some form of judicial review." Makdessian v. City of Mountain View, 152 F. App'x 642, 644 (9th Cir. 2005) (citing Kerley Indus., Inc. v. Pima County, 785 F.2d 1444, 1446 (9th Cir. 1986), and Chongris v. Bd. of Appeal of Andover, 811 F.2d 36, 40-42 (1st Cir. 1987)). See also Lanmar Corp. v. Rendine, 811 F. Supp. 47, 52 (D.R.I. 1993)2 ("[T]he First Circuit has indicated that where a building permit has been in the possession of a developer for more than a brief period of time, and the developer can show that he or she acted in reliance upon it, some type of pre-deprivation hearing is necessary before it can be revoked. Cloutier[ v. Town of Epping], 714 F.2d [1184,] 1191–1192[ (1st Cir. 1983)]; Chongris v. Board of Appeals of Town of Andover, 811 F.2d 36, 39–42 (1st Cir.), cert. denied, 483 U.S. 1021, 107 S. Ct. 3266, 97 L. Ed. 2d 765 (1987).").

must apply the balancing test articulated in <u>Mathews v. Eldridge</u>, 424 U.S. 319, 96 S. Ct. 893, 47 L. Ed. 2d 18, to determine whether pre-deprivation process was required . . . <u>Grayden</u>, 345 F.3d at 1232-33; <u>see also</u> <u>Bailey v. Bd. of County Com'rs of Alachua County, Fla.</u>, 956 F.2d 1112, 1123 n.12 (11th Cir. 1992) ("The need for some form of predeprivation hearing is determined from balancing the competing interests at stake."). Under <u>Mathews</u>, the specific dictates of due process in any given case are determined by considering: (1) the private interest that will be affected by the official action; (2) the risk of an erroneous deprivation of such interest through the procedures used and the probable value, if any, of additional or substitute procedural safeguards; and (3) the government's interest, "including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." 424 U.S. at 335, 96 S. Ct. at 903.

<u>Reams v. Irvin</u>, 561 F.3d 1258, 1263-64 (11th Cir. 2009).

The Court finds that pre-deprivation process in this case was not "impractical," as the deprivation was not "occasioned by a random, unauthorized act by a state employee," but rather "by an established state procedure[,]" <u>Nat'l Ass'n of Boards of Pharmacy</u>, 633 F.3d at 1317 – namely, a municipality's authority to "adopt ordinances and resolutions," Ala. Code § 11-45-1, through "the legislative powers and other powers . . . exercised by the council[,]" Ala. Code § 11-43-43. <u>See</u> *supra*. Consideration of the <u>Mathews</u> factors also weighs in favor of requiring some pre-deprivation form of notice and hearing. KTK would certainly have a substantial private interest affected by the suspension/revocation of its building permit, as it had expended some efforts to obtain it and had expended time and resources on the Circle, as well as entered into at least one contract,[14] in reliance on it. There was also a serious risk of an erroneous deprivation, evidenced by the fact that the City Council voted to suspend the permit after hearing only one side of the issue, the protesters, without allowing KTK an opportunity to present its own concerns. Moreover, the administrative burden of continuing the issue to the next council

---

[14] Though KTK executed its contract with the UDC on August 2, 2012, the day before the building permit was issued, KTK executed its contract with FOF on August 6, 2012.

meeting, or even postponing a vote until later in the meeting to provide KTK notice and time to appear, was minimal. Both of these factors weigh in favor of requiring pre-deprivation process for KTK.

The record indicates that, in suspending/revoking KTK's permit without notice, the City could be said to have been exercising its interests in determining what its rights to control the use of the Circle were and in preventing further clashes between protesters and KTK employees at the Circle. However, undisputed evidence that the City Council did not hold a meeting addressing the issue until approximately a month after the last clash between KTK and the protesters diminishes the weight of any interest in preventing future confrontations, and the fact that private groups had been allowed to make use of the Circle for decades before the City Council suddenly began expressing interest as to what the extent of those rights were diminishes the weight of that interest. As such, this <u>Mathews</u> factor in favor of the City is outweighed by the previously discussed two in favor of KTK.[15]

---

[15] Cf. <u>Holman v. City of Warrenton</u>, 242 F. Supp. 2d 791, 807-08 (D. Or. 2002) ("[T]he Court finds the *Mathews* balancing factors weigh in favor of a pre-deprivation hearing under these circumstances. Plaintiff's private interest in the previously-approved conditional use permit and his entitlement to a building permit in compliance with that use was considerable. Plaintiff already had run the gauntlet of Oregon's land use laws during the conditional use process: Plaintiff had submitted an application for a conditional use permit; Pearson had reviewed the application and recommended approval by the Planning Commission; the Planning Commission held a public hearing on the application after giving proper notice; the Planning Commission had questioned Plaintiff about the proposed use and, in particular, the parking requirements; the Planning Commission had determined Plaintiff's proposed use met the City's zoning requirements; and the Planning Commission had issued the conditional use permit. The time for appellate review of the Planning Commission's decision passed without objection. Plaintiff then spent considerable resources to prepare an application for a building permit that complied with the approved use, including detailed plans and specifications, and he reasonably expected approval of the application would be simple and uncomplicated. By withholding the building permit and requiring Plaintiff to redesign his project in a manner inconsistent with the previously-approved conditional use permit, Defendants deprived Plaintiff of the lawful use of his property and his legitimate entitlement to a building permit without first giving him the opportunity to be heard. []The government interest in effectively denying the building permit and revoking the conditional use permit without a prior hearing was minimal.

Therefore, the Court finds no genuine issue of material fact that, in order to satisfy due process, the City was required to provided KTK notice and the opportunity to be heard prior to the City Council's suspension/revocation of its permit and that it was in fact provided neither.

### V.     Conclusion

In accordance with the foregoing analysis, it is **ORDERED** that the City's Motion for Summary Judgment (Doc. 57) is **DENIED** as to KTK's procedural due process claims <u>only</u> and that KTK's Motion for Partial Summary Judgment (Doc. 58) is **GRANTED**.

**DONE** and **ORDERED** this the **31st** day of **October 2013.**

/s/ Kristi K. DuBose
**KRISTI K. DuBOSE**
**UNITED STATES DISTRICT JUDGE**

---

As previously noted, there is no evidence in the record to show exigent circumstances existed. In addition, there is no evidence to show a predeprivation hearing would have placed undue fiscal or administrative burdens on the City. The City easily, quickly, and cheaply could have provided Plaintiff with an opportunity to be heard at another public hearing before the Planning Commission. []Finally, the Court must consider the risk of erroneous deprivation presented by the procedural safeguards in place in this matter. The record shows no predeprivation procedural safeguards were in place to ensure Defendants properly decided whether to grant Plaintiff's application for a building permit. Even after Defendants' decision to withhold the permit was made, Plaintiff was not given the opportunity to be heard by the Planning Commission, the body that initially determined Plaintiff's use met all zoning requirements. Nonetheless, Defendants seem to argue the risk of erroneous deprivation was negligible because Plaintiff had adequate postdeprivation remedies." (citation and quotation marks omitted)).